UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of the Application of

WHITEHAVEN S.F., LLC,

> Petitioner,

– against –

STEVEN SPANGLER, LANCE WITTRY, ESQ.,
WITTRY LAW OFFICES and HARVEY
THATCHER,

> Respondents.

**OPINION AND ORDER**
13 Civ. 8476 (ER)

Ramos, D.J.:

The instant dispute concerns the validity of an arbitration clause in a litigation financing agreement. Respondent Steven Spangler ("Spangler" or "Respondent Spangler") sought funding for a medical malpractice action in Indiana (the "Skyleign Spangler Litigation") after his daughter, Skyleign Spangler, was delivered stillborn in 2003. To that end, Spangler entered a loan agreement with a man named Harvey Thatcher ("Thatcher") in October 2007 and, pursuant to a separate contract (the "Finance Agreement"), obtained additional funding from Whitehaven S.F., LLC ("Whitehaven" or "Petitioner"), a legal financier, in June 2008. Among other terms, the Finance Agreement contained an arbitration clause.

The Skyleign Spangler Litigation settled in approximately 2012 or 2013. In June 2013, Spangler, deeming the litigation financing agreements that he previously entered unconscionable, filed an action in Indiana state court against Whitehaven and Thatcher, seeking to extinguish their liens and void the Finance Agreement (the "Indiana Proceeding"). Thatcher filed a counterclaim in that action, through which he seeks to recover his losses. Whitehaven, in turn, filed the instant action as a petition for a preliminary injunction and temporary restraining order.

1

Although this Court rejected Whitehaven's initial request for injunctive relief to stay the Indiana Proceeding and compel arbitration, it directed the parties to submit further briefing on (1) the amount in controversy and (2) the enforceability of the arbitration clause in the Finance Agreement.

Presently before the Court is Whitehaven's motion to compel arbitration in accordance with the arbitration clause in the Finance Agreement.  Doc. 6 ("Mem. Supp. Mot. Compel").  For the reasons discussed below, the motion is GRANTED.

## I.    Factual Background

### A.  Parties

Petitioner Whitehaven is a Delaware corporation with a principal place of business in New York.  Mem. Supp. Mot. Compel 5.  Whitehaven provides non-recourse cash advances to injured individuals who have a pending claim or lawsuit, meaning that they do not have to repay the money advanced by Whitehaven in the event that their lawsuit is "lost, dismissed or otherwise result[s] in no recovery."  *Id.*

Respondent Spangler is a Florida resident.  *Id.*  Lance Wittry ("Wittry"), an Indiana attorney, represents Spangler.  Thatcher is also an Indiana resident.  Harvey Thatcher Answer and Countercl., *Spangler v. Thatcher, Whitehaven S.F. LLC* (Ind. Sup. Ct. Marion Cnty. 2013).  Whitehaven initially named Thatcher, Wittry and his firm, the Wittry Law Offices, as Respondents in the instant action.  Spangler Opp. 1, Doc. 10.  As explained *infra*, however, Whitehaven only seeks to compel Spangler to arbitrate.

### B.  Skyleign Spangler Litigation

Skyleign Donae Lashel Spangler ("Skyleign") was the full-term baby daughter of Steven Spangler and Heidi Brown ("Ms. Brown").  *Spangler v. Bechtel*, 931 N.E.2d 387, 388-89 (Ind.

Ct. App. 2010), *transfer granted*, *opinion vacated*, 940 N.E.2d 832 (Ind. 2010) and *vacated*, 958 N.E.2d 458 (Ind. 2011).  Tragically, Skyleign was delivered stillborn on February 24, 2003.  *Id.* at 389.  On June 23, 2003, Spangler and Ms. Brown initiated the Skyleign Spangler Litigation in Indiana state court, seeking damages for negligent infliction of emotional distress against the hospital where Skyleign died, a nurse-midwife, and the nurse-midwife's employer.  *Id.*

### C.  The Promissory Note between Spangler and Thatcher

On October 18, 2007, Thatcher agreed to loan Spangler $55,200.00 to help finance the ongoing Skyleign Spangler Litigation (the "Promissory Note").  Thatcher Br. Ex. 1, Doc. 12. According to the terms of the Promissory Note, the loan would be interest-free until the maturity date, at which point an interest rate of eight percent per year would apply.  *Id.*  The sum owed would be due on the earlier of April 15, 2008 or seven days from the date that Spangler received a final settlement or award from the Skyleign Spangler Litigation.  Per its terms, Indiana law governs construction of the Promissory Note.  *Id.*  Finally, it states:

> [I]f any sum payable is not paid when due, or if [Spangler] or any other person liable upon this [Promissory Note] shall die, become insolvent, *or make a general assignment for the benefit of creditors, then all the amounts owed, including all future installments, shall immediately become due and payable on demand of [Thatcher]*.  No delay on [Thatcher]'s part in exercising any power or right under this note shall operate as a waiver of that power or right.  [Spangler] shall further pay all expenses incurred by [Thatcher], including reasonable attorney fees incurred by [Thatcher] in successfully enforcing … this [Promissory Note].

*Id*. (emphasis added).

### D.  Agreements between Spangler and Whitehaven

#### 1.  The Finance Agreement

To further finance the Skyleign Spangler Litigation, Spangler entered into the Finance Agreement with Whitehaven on June 23, 2008.  Mem. Supp. Mot. Compel 5.  Through the Finance Agreement, Whitehaven agreed to advance $50,000.00 to Spangler.  Spangler Opp. Ex.

3

2 (Finance Agreement ¶ 5(a)).  In turn, Spangler agreed that, at the conclusion of the Skyleign Spangler Litigation, "whether by settlement, judgment or otherwise," he would repay Whitehaven, and direct his attorney to pay Whitehaven, (1) an application fee of $500.00; (2) "the sum of $50,000.00 together with an application fee of $500.00 and an origination fee of $5,000 plus 4.99% per month interest, compounded monthly from the date of funding to the date of payment," from the litigation proceeds.  *Id.*  Regardless of the duration of the loan, the Finance Agreement obligated Spangler to repay Whitehaven a *minimum* of $85,000.  *Id*. ¶ 5(b). The entirety of paragraph five of the Finance Agreement, the section that describes the minimum payment owed and the terms of repayment, appears in bold text on the second page.  *Id.* ¶ 5.

The Finance Agreement sets forth the following order of priority for distribution of any proceeds from the Skyleign Spangler Litigation:

a.  To [Spangler]'s attorney(s) as and for reimbursement of case disbursements and the legal fee;
b.  Liens with priority by operation of law;
c.  To [Whitehaven] in the amount which may be due pursuant to paragraph 5 of this Agreement (said sum being the initial advance plus profit);
d.  To [Spangler], or his/her successors or assigns.

*Id*. ¶ 9.

The Finance Agreement also includes the following disclaimers:

1.  [Spangler] HAS BEEN ADVISED AND INSTRUCTED BY [Whitehaven] THAT HE . . . SHOULD SEEK THIS FUNDING FROM SOURCES OTHER THAN [Whitehaven], INCLUDING BUT NOT LIMITED TO BANKS, CREDIT CARDS, FAMILY, FRIENDS, ETC.

2.  [Spangler] HAS BEEN ADVISED BY [Whitehaven] THAT [Whitehaven] IS A PROVIDER OF FUNDS OF LAST RESORT AND THAT OTHER SOURCES OF FUNDS AND/OR FINANCING, IF AVAILABLE, WOULD LIKELY BE LESS EXPENSIVE.

…

8.   [Spangler] ACKNOWLEDGES AND FULLY UNDERSTANDS THAT [Whitehaven] MAY MAKE A SUBSTANTIAL PROFIT ON THIS TRANSACTION.

…

**19.   [Spangler] HAS ALSO BEEN ADVISED BY [Whitehaven] TO HAVE HIS . . . ATTORNEY IN HIS . . . CASE REVIEW THIS AGREEMENT. PLAINTIFF HAS SOUGHT AND OBTAINED THE ADVICE OF LEGAL COUNSEL PRIOR TO ENTERING THIS TRANSACTION.**

20.   [Spangler] acknowledges that all questions [Spangler] has had regarding the funding terms of this Agreement, including the terms of repayment, have been answered to his . . . satisfaction by [Whitehaven] and/or his . . . attorney.

21.   [Spangler] acknowledges that he . . . fully understands the terms of this Agreement and entered into this Agreement of his . . . own free will.

22.   PLAINTIFF HAS THE RIGHT TO EXAMINE THIS AGREEMENT AND TO CANCEL THIS AGREEMENT.  PLAINTIFF MAY RETURN IT AND THE MONIES ADVANCED PURSUANT TO THIS AGREEMENT BY MAIL OR OTHER DELIVERY TO [Whitehaven] AT THE ADRESS CONTAINED IN THIS AGREEMENT WITHIN THREE (3) DAYS AFTER [Spangler] RECEIVES THEM.  THIS AGREEMENT WILL BE VOID FROM THE BEGINNING IF [Spangler] RETURNS THIS AGREEMENT AND THE FULL MONIES ADVANCED TO HIM . . . WITHIN THIS THREE (3) DAY PERIOD.

*Id*. ¶¶ 1, 2, 8, 19-22 (emphasis in original).

Finally, and of particular significance here, the Finance Agreement contains an arbitration clause, which states:

26.   Any controversy or claim arising out of or relating to this contract, including without limitation the interpretation, validity, enforceability or breach thereof, shall be settled by final, binding arbitration administered by the American Arbitration Association (hereinafter referred to as "AAA") in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitrator shall be a practicing attorney or a retired judge licensed to practice in the State of New York.  The parties also agree that the AAA Optional Rules for Emergency Measures of Protection shall apply to the proceedings.  The arbitrator shall award to the prevailing party, if any, as determined by the arbitrator, all of its costs and fees.  "Costs and fees" means all pre-award expenses of the arbitration … The award shall be in writing, shall be signed by the arbitrator, and shall include a statement regarding the reasons for the disposition of any claim.  Arbitration pursuant to this paragraph shall be

filed and held in the New York Regional Office located in the county, city and State of New York.

*Id*. ¶ 26.  General severability and choice of law clauses in the Finance Agreement provide that New York law controls the interpretation of its terms and the parties' rights thereunder, and that, if any of its provisions are stricken as invalid, its other clauses will remain intact.  *Id*. ¶¶ 27-28.

### 2.  The Acknowledgement

On June 23, 2008, the same date that they executed the Finance Agreement, both Spangler and Wittry, in his capacity as Spangler's lawyer, signed a "Plaintiff's Lien in Favor of [Whitehaven] and Attorney Acknowledgement" (the "Acknowledgement"), which recognized that they received both the Acknowledgement and the Finance Agreement.  Spangler Opp. Ex. 2 at 7-8.  Through the Acknowledgement, Spangler explicitly accepted that, in the event of a structured settlement, Whitehaven would be paid before him—indeed, he agreed that he and his assigns would not receive *any* settlement funds until Whitehaven had been paid in full.  *Id.*

The Acknowledgement further states that:

[Spangler] AND HIS . . . ATTORNEYS REPRESENT THAT [Spangler] HAS NOT PREVIOUSLY GRANTED ANY LIENS AND/OR ASSIGNMENTS OF PROCEEDS OF THIS CASE OR TRANSFERRED OR CONVEYED ANY RIGHT TO ANY PORTION OF THE PROCEEDS TO ANY PERSON OR ENTITY, EXCEPT IF COMPLETED BELOW AS FOLLOWS:

| NAME | PRESENT AMOUNT OWED |
| --- | --- |
| BROWN TOMPKINS & LORY | $ 7,000.00 |
| HARVEY THATCHER | $ 13,000.00 |

*Id*. at 8 (underline in original).

Although Wittry executed the Acknowledgement, he handwrote the following remark on it:  "Note:  I have signed, acknowledged & agreed to this lien per Mr.

Spangler's request, but can provide no advice or counsel to Mr. Spangler with respect thereto.  Lance Wittry."  *Id.*

### E.   Prior Proceedings

The Skyleign Spangler Litigation settled in "2012 or 2013"[1] for the sum of $812,000.00. Mem. Supp. Mot. Compel 7.  Whitehaven asserts that, without consulting either it or Thatcher, Wittry disbursed attorney's fees of $152,579.62 to himself and "the bulk" of the settlement funds to Spangler and Ms. Brown.[2]  *Id.*  Whitehaven further claims that Wittry sent Whitehaven a stream of "heated missives" denying the legitimacy of the Finance Agreement and demanding that Whitehaven renounce any right to recovery.  *Id.* at 8.  Spangler, however, claims that, while Ms. Brown received proceeds from the settlement, none were paid to him.  Spangler Opp. 6.

On June 7, 2013, Spangler initiated the Indiana Proceeding, a declaratory judgment action filed against Whitehaven and Thatcher in Marion County Superior Court,[3] seeking to extinguish their liens on the grounds of usury, champerty[4] and unconscionability.  Thatcher filed an answer, a counterclaim against Spangler and cross-claim against Whitehaven in that case.  *Id.*

---

[1] None of the parties have provided an exact date.

[2] Ms. Brown never signed the Promissory Note or the Finance Agreement; as such, Spangler asserts that her ability to recover proceeds from the Skyleign Spangler Litigation is entirely independent from his right to recovery. Spangler Opp. 5.

[3] Case number 49D02-1306-MI-023616.

[4] Black's Law Dictionary defines champerty as "[a]n agreement between a stranger to a lawsuit and a litigant by which the stranger pursues the litigant's claim as consideration for receiving part of any judgment proceeds." *Midtown Chiropractic v. Illinois Farmers Ins. Co.*, 812 N.E.2d 851, 854 (Ind. Ct. App. 2004) (quoting Black's Law Dictionary 224 (7th ed. 1999)), *vacated on other grounds*, 847 N.E.2d 942 (Ind. 2006).  *See also Trust for Certificate Holders of Merrill Lynch Mrtg. Investors, Inc. v. Love Funding Corp.*, 591 F.3d 116, 121 (2d Cir. 2010) (citing N.Y. Judiciary Law § 489(1)) (describing New York's statutory prohibition against champerty).

**F.  The Instant Action**

On November 26, 2013, Whitehaven brought the present action as an emergency petition to stay the Indiana Proceeding and compel arbitration.  Docs. 1-2.  On December 4, 2013, the Court denied Whitehaven's request for a preliminary injunction, reserved decision on the issue of whether to compel arbitration, and directed the parties submit further briefing regarding (1) the amount in controversy and (2) the enforceability of the mandatory arbitration clause in the Finance Agreement.  Whitehaven represents that the state court subsequently stayed the Indiana Proceeding pending this Court's determination of the validity of the arbitration clause.  Reply Supp. Mot. Compel 9, Doc. 9; Reply Opp. Thatcher Br. 3, Doc. 16.

On December 16, 2013, Whitehaven filed its opening brief in support of its motion to compel Spangler to arbitrate.  *See* Mem. Supp. Mot. Compel.  Whitehaven argues, *inter alia*, that the arbitration clause is valid, that Spangler entered the Finance Agreement with the benefit of advice from counsel, that the federal preference to arbitrate is strong, and that the authority on which Spangler relies lacks force here because, as a Floridian, he cannot avail himself of state law protections that solely benefit New Yorkers.  *See generally* Reply Supp. Mot. Compel.

Spangler asserts that the Finance Agreement constitutes a contract of adhesion and requests that the Court annul the mandatory arbitration clause.  Spangler Opp. 8-11.  He principally challenges the enforceability of the arbitration clause on the grounds that it violates an agreement reached between Whitehaven and the New York State Attorney General in February 2005 (the "2005 Assurance of Discontinuance" or the "Assurance"), through which Whitehaven did not admit any wrongdoing, but "voluntarily relinquished" its right to use mandatory arbitration clauses in its litigation funding contracts with "New York consumers." *Id.* at 9, Ex. 1.  Spangler argues that, even though he is not a New York resident, the protections

afforded by New York law—which, he claims, includes the 2005 Assurance of Discontinuance—extend to him in this case because he "consumed" from the New York marketplace, New York substantive law governs the Finance Agreement, Whitehaven is a New York business, Whitehaven disbursed funds to Spangler through a New York bank account, and residency is not a prerequisite to protection from New York consumer laws. *Id.* at 7-8, 14-17.

Spangler further asserts that, although "[t]he New York legislature has erected no law abridging Whitehaven's right to privately contract for arbitration" (*id.* at 7), the Assurance wherein Whitehaven voluntarily surrendered that right "was made and executed under the authority of several New York statutes that give [it] the force and effect of law." *Id.* at 10-11. Spangler claims that because he has been injured by Whitehaven's violation of the terms of the Assurance, he is now entitled to enjoin Whitehaven from enforcing the mandatory arbitration clause in the Finance Agreement. *Id.* at 11.

In a separate opposition brief, Thatcher joins Spangler's arguments regarding the invalidity of the arbitration clause and asserts that the Indiana Proceeding should not be stayed, as it would prevent him from obtaining a judgment against Spangler through his counterclaim. Thatcher Br. 2, Doc. 12. Thatcher contends that Spangler failed to repay him on the terms set forth in the Promissory Note and is in default for the entire sum due. *Id.* at 5-6. Specifically, Thatcher claims that, because the Promissory Note obligated Spangler to repay him upon demand if Spangler made a general assignment of the settlement proceeds for the benefit of creditors, upon entering the Finance Agreement—in which Spangler made a general assignment to Whitehaven—Spangler was obliged to pay him the sum owed under the Promissory Note. *Id.* Thatcher also argues that the Court cannot compel him to arbitrate because he did not sign the Finance Agreement and "certainly [is] not a third party beneficiary" of it. *Id.* at 2.

Whitehaven claims that it is "wholly confused" by Thatcher's position because, as Thatcher acknowledges, it has consistently represented that it is not seeking to arbitrate against him. Whitehaven argues that Thatcher lacks any cognizable claim against it and lacks standing to challenge the arbitration clause because, as he concedes, he did not sign—and is not a third-party beneficiary of—the Finance Agreement. Reply Opp. Thatcher Br. 3-5.

## II.   Legal Standard

Section 4 of the Federal Arbitration Act (the "FAA" or the "Act") requires courts to compel arbitration in accordance with the terms of an arbitration agreement, upon the motion of either party to the agreement, provided that there is no issue regarding its creation. *AT&T Mobility LLC v. Concepcion*, -- U.S. --, 131 S. Ct. 1740, 1748-49 (2011) (citing 9 U.S.C. § 4). "In the absence of an agreement by the parties to submit the matter of arbitrability to the arbitrator, the question of whether or not a dispute is arbitrable is one for the court." *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011). When resolving a motion to compel arbitration, "the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (citations omitted). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Id*. Yet, "where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia*, 661 F.3d at 172 (citing *Bensadoun*, 316 F.3d at 175).

Courts in this Circuit must determine four issues in the context of a motion to compel arbitration:  (1) whether the parties in fact agreed to arbitrate; (2) the scope of the arbitration agreement; (3) if the parties assert federal statutory claims, whether Congress intended those

claims to be nonarbitrable; and (4) if the court concludes that some, but not all, of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration. *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (quoting *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75-76 (2d Cir. 1998)); *accord Champion Auto Sales, LLC v. Polaris Sales Inc.*, 943 F. Supp. 2d 346, 351 (E.D.N.Y. 2013).

When assessing the validity of an arbitration agreement, "the general rule is that courts should apply ordinary state-law principles that govern the formation of contracts." *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 344 (2d Cir. 2010) (internal quotation marks and citation omitted). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91-92 (2000). Whether it argues that arbitration is improper because "the arbitration agreement is invalid under a defense to contract formation," or asserts that "the arbitration contract does not encompass the claims at issue," either way, the resisting party shoulders the burden of proving its defense. *Kulig v. Midland Funding, LLC*, No. 13 Civ. 4715 (PKC), 2013 WL 6017444, at *2 (S.D.N.Y. Nov. 13, 2013).

Moreover, "federal policy strongly favors arbitration as an alternative dispute resolution process," thus, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," and "[f]ederal policy requires [courts] to construe arbitration clauses as broadly as possible." *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995); *see also, e.g.*, *Champion Auto Sales*, 943 F. Supp. 2d at 351 (citing *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010)) ("In keeping with this policy, the Court resolves doubts in favor of arbitration and enforces privately-negotiated arbitration agreements in accordance with their terms."). "[U]nless it may be said with positive assurance" that the

arbitration clause does not cover the disputed issue, the court must compel arbitration.  *Aerotel, Ltd. v. RSL Commc'ns, Ltd.*, 99 F. Supp. 2d 368, 372 (S.D.N.Y. 2000).

Despite the federal policy favoring arbitration, however, courts only apply the "presumption of arbitrability" if an "*enforceable* arbitration agreement is ambiguous about whether it covers the dispute at hand."  *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301-02 (2010) (emphasis added); *see also Allstate Ins. Co. v. Mun*, 751 F.3d 94, 97 (2d Cir. 2014).  Put differently, although "doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made."  *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, -- F.3d --, No. 13 Civ. 797, 2014 WL 4099289, at *4 (2d Cir. Aug. 21, 2014) (quoting *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011)).  "It is the court's duty to interpret and construe an arbitration provision, but only where a contract is 'validly formed' and 'legally enforceable.'"  *Kulig*, 2013 WL 6017444, at *2 (citations omitted).

## III.   Discussion

### A.  This Court has Jurisdiction to Rule on the Instant Motion.

The FAA provides district courts with jurisdiction to compel arbitration.  *See* 9 U.S.C. § 4.[5]  Yet, because the FAA "does not independently confer subject matter jurisdiction on the federal courts," "there must be an independent basis of jurisdiction before a district court may

---

[5] Specifically, the Act provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

*See* 9 U.S.C. § 4.

entertain petitions under the Act." *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62-63 (2d Cir. 2009). Here, the Court finds that the parties have satisfied the requirements for diversity jurisdiction. *See* 28 U.S.C. § 1332. First, the amount in controversy exceeds $75,000 given that, under the terms of the Finance Agreement, Spangler agreed to pay Whitehaven a minimum of $85,000. Mem. Supp. Mot. Compel 13; Spangler Opp. Ex. 2 at 2.[6] *Id.* § 1332(a). Second, the parties satisfy the citizenship requirement since Spangler is a Florida resident, Whitehaven is a Delaware corporation with a principal place of business is in New York, and Wittry, his law office and Thatcher are Indiana residents. Mem. Supp. Mot. Compel 5; Spangler Opp. 1.

### B. The Arbitration Clause in the Finance Agreement Is Valid.

The Court finds that the parties agreed to arbitrate and therefore, claims concerning the validity, enforceability and breach of the Finance Agreement must be arbitrated. "Whether or not the parties have agreed to arbitrate is a question of state contract law." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012). Here, the Finance Agreement provides that New York law governs its interpretation, and it is undisputed that the Court should apply New York law for the purpose of deciding the instant motion. Spangler Opp. 13, Ex. 2. at 5; Mem. Supp. Mot. Compel 6.

Under New York law, the starting presumption is that contracts are legal and enforceable. *See, e.g.*, *Brum v. City of Niagara Falls*, 145 A.D.2d 928, 535 N.Y.S.2d 856, 857 (App. Div. 4th Dep't 1988). In addition, "a party who signs or accepts a written contract is conclusively presumed to know its contents and to assent to them." *Gold v. Deutsche Aktiengesellschaft*, 365

---

[6] Although they agree with respect to the $85,000.00 minimum, the parties dispute the amount and existence of an obligation cap. While Whitehaven alleges that it agreed to cap the obligation at $500,000.00 (Mem. Supp. Mot. Compel 13), Spangler claims that he was not offered and did not accept a $500,000.00 obligation limit, and that such negotiations should not occur via pleadings (Spangler Opp. 6).

F.3d 144, 149 (2d Cir. 2004) (internal quotation marks and citation omitted).  Moreover,

consistent with the FAA, the party challenging the agreement—here, Spangler—bears the burden

of proving its invalidity.  *See, e.g.*, *Barbieri v. K-Sea Transp. Corp.*, 566 F. Supp. 2d 187, 192

(E.D.N.Y. 2008) (party challenging arbitration agreement bears burden of proof).

Courts do not ordinarily involve themselves in overseeing the formation or approval of

contracts and "will enforce them unless illegal, against public policy or deficient in some other

respect."  *64th Associates, L.L.C. v. Manhattan Eye, Ear & Throat Hosp.*, 2 N.Y.3d 585, 589-90,

813 N.E.2d 887 (N.Y. 2004); *see also Sternaman v. Metro. Life Ins. Co.*, 170 N.Y. 13, 62 N.E.

763 (N.Y. 1902) (observing that the parties' generally unfettered "right to make such contracts as

they see fit … is restricted by legislation, public policy and by the nature of things[.]").  Because

contracts against public policy are void, it is well-established that courts will not enforce such

contracts or "recognize rights arising from them."  *Providence Tool Co. v. Norris*, 69 U.S. 45, 47

(1864); *Szerdahelyi v. Harris*, 67 N.Y.2d 42, 48, 490 N.E.2d 517 (N.Y. 1986).

The Court of Appeals has long-defined New York's "public policy" as "'the law of the

[s]tate, whether found in the Constitution, the statutes or judicial records.'"  *Lewis v. New York

State Dep't of Civil Serv.*, 60 A.D.3d 216, 222, 872 N.Y.S.2d 578, 584 (App. Div. 3d Dep't

2009), *aff'd sub nom. Godfrey v. Spano*, 13 N.Y.3d 358, 920 N.E.2d 328 (N.Y. 2009) (citation

omitted); *see also Muschany v. United States*, 324 U.S. 49, 66 (1945) ("Public policy is to be

ascertained by reference to the laws and legal precedents and not from general considerations of

supposed public interests.").  "Those sources express the public will and give definition to the

term."  *Matter of Estate of Walker*, 64 N.Y.2d 354, 359, 476 N.E.2d 298, 301 (N.Y. 1985).  If

one party wants to show that a certain act violates public policy that is not the law of the state,

then it has to establish that such an act "would violate some fundamental principle of justice,

some prevalent conception of good morals, some deep-rooted tradition of the common weal

expressed in them."   *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 202, 480 N.E.2d 679,

688 (N.Y. 1985).

### a. The 2005 Assurance of Discontinuance Does Not Render the Arbitration Clause Invalid.

Spangler argues that the arbitration clause in the Finance Agreement is "invalid, unlawful

and illegal, unenforceable and/or unconscionable" because it violates the 2005 Assurance of

Discontinuance between Whitehaven and the New York Attorney General.  Spangler Opp. 9; *see

also id.* at Ex. 1 (Assurance).  Because Spangler has failed to sufficiently establish that the

Assurance carries "the force and effect of law" (*id.* at 11), however, the Court finds that its

existence does not render the arbitration clause in this case illegal or contrary to public policy.

The Assurance is an agreement between nine litigation financing companies, including

Whitehaven, and then-New York State Attorney General Eliot Spitzer (the "Attorney General")

that resulted from the Attorney General's concern that non-native English speakers might have

difficulty understanding litigation financing contracts.  The preamble to the Assurance states that

the Attorney General "reviewed certain business practices" of these nine companies, all of which

"engaged in the business of providing cash advance transactions with consumers who have

pending personal injury claims or actions."  Spangler Opp. Ex. 1 (Assurance at 1-2).

Furthermore, "[c]ertain of the[se] Companies advertise[d] their services in New York, in both

English and Spanish," and "some of the consumers with whom the Companies contract[ed]

[were] Spanish speaking and/or [did] not read English fluently."  *Id.* (Assurance at 2).

According to the Assurance, these nine litigation financiers typically agreed to provide

consumers with cash advances in exchange for their right to receive an amount "often …

significantly in excess of its advance, out of the proceeds of any realized settlement."  *Id.*

Based on the Attorney General's "concern[] that consumers may not adequately understand the terms of the contracts with the Companies and thus may not be able to make a reasoned decision as to whether to enter into such transactions," he identified several common features of these transactions "which may have the tendency and capacity to violate applicable New York law," specifically:  the lack of disclosure of the annualized percentage rate of return and disclosures that may fail to signal to consumers "the considerable degree to which their total cost may vary depending on the length of the time that passes before the repayment is made"; the lack of adequate written translations for non-native English speakers; the lack of an opportunity for consumers to cancel the transaction without a penalty, within a reasonable time; and the lack of a requirement that consumers' attorneys confirm in writing that they explained the terms of the contract to the consumer.  *Id.* (Assurance at 3).  However, the Assurance does not state that Whitehaven or any of the other signatories actually committed violations of New York law.

To address the Attorney General's concerns, by signing the Assurance, Whitehaven and the other litigation financiers agreed that, on or after 90 days of the date of the Assurance, "with respect to all transactions with *New York consumers* who enter into cash advance transactions" (*see* Spangler Opp. Ex. 1 (Assurance) (emphasis added)):

1. All contracts shall be in compliance with General Obligations Law 5-702 (Plain Language law).[7]

2. All contracts shall be completely filled in and contain the following disclosures … on the front page in at least 12-point bold type, appropriately headed … :

   a) The total amount to be advanced to the consumer;

---

[7] Specifically, this subsection of the General Obligation Law requires certain written agreements to be "[w]ritten in a clear and coherent manner using words with common and every day meanings" and "[a]ppropriately divided and captioned by its various sections."  N.Y. Gen. Oblig. Law § 5-702 (McKinney).  However, it further provides that "[a] violation of the provisions of subdivision of this section *shall not render any such agreement void or voidable nor shall it constitute [a] defense to any action or proceeding to enforce such agreement*."  *Id.* (emphasis added). "[W]henever the attorney general finds that there has been a violation of this section, he may proceed as provided in subdivision twelve of section sixty-three of the executive law," i.e., obtain a court order or assurance of discontinuance, discussed *infra*.  *Id.*

b) Itemization of one-time fees, broken out item by item (e.g. application, processing, attorney review, broker, etc.);

c) Percentage fee or rate of return, stated on an annualized basis, including frequency of compounding;

d) Total amount to be repaid by the consumer, broken out by six month intervals, carried forward to 36 months, and including all fees as well as any minimum required payment amount.

3. All contracts shall provide that the consumer may cancel the contract within five business days following the consumer's receipt of funds, without penalty or further obligation. The contract shall contain the following notice written in a clear and conspicuous manner: "NEW YORK CONSUMER'S RIGHT TO CANCELLATION: YOU MAY CANCEL THIS CONTRACT WITHOUT PENALTY OR FURTHER OBLIGATION WITHIN FIVE BUSINESS DAYS FROM THE DATE YOU RECEIVE FUNDING FROM [name of company]." …

4. The consumer shall initial each page of the contract.

5. All contracts shall contain a legend, immediately above the consumer's signature, in at least 12-point boldface type, to read:

DO NOT SIGN IF THIS CONTRACT BEFORE YOU READ IT COMPLETELY OR IF IT CONTAINS ANY BLANK SPACE. BEFORE YOU SIGN THIS CONTRACT YOU SHOULD OBTAIN THE ADVICE OF YOUR ATTORNEY. YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS CONTRACT.

6. All contracts shall contain a written certification by the consumer's attorney of record that (s)he has reviewed the contract and explained to the consumer its terms, including the annualized rate of return applied to calculated the amount to be paid by the consumer.

7. For English and Spanish speaking consumers, contracts shall be written in the same language in which the oral negotiations are conducted between the COMPANY and the consumer. For consumers whose primary language is neither English nor Spanish: (i) the "principal terms" of the contract shall be translated in writing into the consumer's native language; (ii) the consumer shall sign the translated document containing the "principal terms" and initial each page; and (iii) the translator shall sign a notarized affirmation confirming that the "principal terms" have been presented to the consumer in his native language and acknowledge by the consumer, in writing. For purposes of this agreement, "principal terms" shall include all of the items required to be disclosed by paragraph 2 above … as well as the legend in paragraph 5 above.

8. To the extent that the contract provides for attorneys['] fees and costs … Any contractual cap on such attorneys['] fees and costs shall apply equally to both parties.

9. No contract may require mandatory arbitration to resolve disputes under the contract.

IT IS FURTHER AGREED that nothing contained herein shall be construed so as to deprive any individual of any private right of action under the law.

… IT IS FURTHER AGREED that the Companies shall not represent or imply that any business acts or practices hereafter used or engaged in by the Companies have been approved, in whole or in part, by the Attorney General of the State of New York.

IT IS FURTHER AGREED … that each of the Companies will pay to the Attorney General the sum of $5,000.00 as costs.

*Id.* (emphasis in original).

Spangler asserts that the Assurance prohibits Whitehaven from including mandatory arbitration clauses in litigation financing agreements with New York consumers such as himself. Without citing any case law in support of his position, Spangler contends that the Assurance has the force and effect of New York law because it (1) was issued pursuant to Executive Law § 63 (15), which provides that "[e]vidence of a violation of such assurance shall constitute prima facie proof of violation of the applicable law" and (2) "referenc[es]" Article 22-A, which includes General Business Law § 349 (h), a law providing that "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice." Spangler Opp. 10-11 (citing N.Y. Exec. Law § 63; N.Y. Gen. Bus. Law § 349). "Though Whitehaven's 'loss' of arbitration rights was not occasioned by unilateral state action, but by its own agreement and consent, ratification and intent," Spangler asserts, "that does not mean that once the agreement was reached, its terms lack the *force and effect* of law." *Id.* at 10 (emphasis in original). These arguments lack merit.

First, the 2005 Assurance of Discontinuance is not a law of the state, nor is it a public policy, given that it is not found in the constitution, statutes or judicial records of New York.[8] *Lewis*, 60 A.D.3d at 222.  Rather, the Assurance is an agreement that the Attorney General, acting pursuant to his authority under New York Executive Law § 63(15), reached with various member companies of the American Legal Finance Association, including Whitehaven.  *Id.* at Ex. 1.  In relevant part, Executive Law § 63 authorizes the Attorney General to seek an order from New York State Supreme Court enjoining fraudulent or illegal business activities whenever he determines that a person or business has engaged in "repeated fraudulent of illegal acts or otherwise demonstrate[d] persistent fraud or illegality in the carrying on, conducting or transaction of business" in New York.  N.Y. Exec. Law § 63(12).  *Id.*  Of particular significance, the Executive Law further states that:

> In any case where *the attorney general* has authority to institute a civil action or proceeding in connection with the enforcement of a law of this state, *in lieu thereof he may accept an assurance of discontinuance of any act or practice in violation of such law from any person engaged or who has engaged in such act or practice.*  Such assurance may include a stipulation for the voluntary payment by the alleged violator of the reasonable costs and disbursements incurred by the attorney general during the course of his investigation.  *Evidence of a violation of such assurance shall constitute prima facie proof of violation of the applicable law in any civil action or proceeding thereafter commenced by the attorney general.*

*Id.* at § 63(15) (emphasis added).

Here, in lieu of bringing a civil action against Whitehaven or seeking a court order, the Attorney General accepted the Assurance, to which Whitehaven voluntarily agreed.[9]  The plain terms of the Assurance state that Whitehaven and its other signatories "[were] willing to enter

---

[8] Spangler fails to cite any authority in support of his theory that the Assurance "has the force and effect of law," nor does he provide any case law indicating that a private citizen may sue to enforce the terms of an Assurance reached between private companies and the Attorney General.  *See* Spangler Opp. 6, 11.

[9] There is no indication that any court so ordered or approved the Assurance.

into this Agreement and settle and resolve the Attorney General's concerns, *without admitting that the Companies have violated any law or otherwise committed any wrongful or improper act*, and the Attorney General [wa]s willing to accept this agreement to resolve his concerns." Spangler Opp. Ex. 1 (Assurance at 3-4) (emphasis added).[10]  Executive Law § 63(12) empowers the Attorney General "to seek injunctive relief even [if] the improper conduct has ceased because 'voluntary discontinuance of improper or illegal activity is no assurance that such activity will not be resumed.'"  *In re Ngan Gung Rest., Inc.*, 183 B.R. 689, 693 (Bankr. S.D.N.Y. 1995) (citation omitted).  While it is true that, in accordance with the express terms of Executive Law § 63, a violation of an assurance could serve as *prima facie* proof of a violation of law, it can only serve as such evidence in "[a] civil action or proceeding … *commenced by the attorney general*." N.Y. Exec. Law § 63(15) (emphasis added).  While the Executive Law grants enforcement powers to the Attorney General, § 63 does not create a private right of action for citizens to enforce the terms of an assurance between the Attorney General and a private company.[11]

---

[10] An assurance of discontinuance is similar to a settlement agreement.  *See, e.g.*, *James, Hoyer, Newcomer, Smiljanich & Yanchunis, P.A. v. State, Office of Atty. Gen.*, 27 Misc. 3d 1223(A), 910 N.Y.S.2d 762 (Sup. Ct. N.Y. Cnty. 2010) (characterizing an Assurance of Discontinuance with the Office of the Attorney General of New York as a settlement); *Geiger v. Town of Greece*, No. 07 Civ. 6066 (CJS), 2008 WL 728471, at *3-*4 (W.D.N.Y. Mar. 18, 2008) (same); *People v. Condor Pontiac, Cadillac, Buick & GMC Trucks, Inc.*, No. 02-1020, 2003 WL 21649689, at *5 (Sup. Ct. N.Y. Cnty. July 2, 2003) ("The Assurance ... is a stipulation of settlement, which binds the parties. Stipulations of settlement made in writing and subscribed to by the parties will not be set aside or departed from absent a showing of such good cause as would invalidate a contract.").

[11] Thatcher also claims that Whitehaven "violated the Assurance giving rise to a private right of action to enforce a violation under Executive Law § 63(15) and [GBL] Article 22-A," but similarly fails to provide any supporting authority.  The Court declines to read a private right of action into Executive Law § 63.  This law describes the *Attorney General's* enforcement powers and solely contemplates enforcement actions by the Attorney General. Where, as here, a statute does not provide for an express private right of action, the courts will only imply one after considering:  "'(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme.'"  *Schlessinger v. Valspar Corp.*, 817 F. Supp. 2d 100, 104 (E.D.N.Y. 2011), *aff'd*, 723 F.3d 396 (2d Cir. 2013) (quoting *Ahmad v. Nassau Health Care Corp.*, 8 A.D.3d 512, 513, 779 N.Y.S.2d 520 (App. Div. 2d Dep't 2004)).  Here, the dispositive and "'most critical' factor … is whether such an action would create 'unwarranted interference with the legislative scheme.'"  *Id.* (citing *Hudes v. Vytra Health Plans Long Island*, 295 A.D.2d 788, 789, 744 N.Y.S.2d 80 (N.Y. App. Div. 3d Dep't 2002)).  The Court finds that "reading an implied right of action into [Executive Law § 63] would not comport with the Legislative scheme of that statute," particularly because the Legislature specifically amended the law in 1980 to

Spangler's argument ultimately amounts to an assertion that because the assurance was created pursuant to the Attorney General's powers under the Executive Law, it too must carry the force and effect of law. The Court is not aware of any authority that supports this position, and Spangler has provided none.

Moreover, the Assurance contains qualifying language (1) indicating that Whitehaven *never admitted to violating any law* or otherwise committing any wrongful act, and (2) prohibiting Whitehaven from representing or implying that the practices it engages in *after* the Assurance, presumably in compliance with the Assurance, "have been approved … by the Attorney General." *See* Spangler Opp. Ex. 1 (Assurance at 6-7). This language suggests that compliance with the Assurance does not amount to compliance with the law, and—except in a proceeding brought by the Attorney General—violation of the Assurance would not necessarily constitute evidence of violation of the law, as Whitehaven admitted to no wrongdoing, and the Assurance only described practices identified by the Attorney General that "*may* have the tendency and capacity to violate applicable law." Spangler Opp. Ex. 1 (Assurance at 3 ¶ 7). Thus, the Court finds that the Assurance does not rise to the level of a "law of the state." To hold otherwise would essentially grant the Attorney General the authority to create legislation simply by entering into negotiated settlements with private parties.

---

create a private right of action under GBL § 349, but declined to do so in other areas, including the Executive Law. *Id.* ("Given that the Legislature has explicitly provided for private rights of action in other sections of Article 26, and found it necessary to amend Article 22–A (section 349) where the statute provided only for enforcement by the Attorney General, the Court concludes that reading an implied right of action into section 395–a would not comport with the Legislative scheme of that statute."); *Varela v. Investors Ins. Holding Corp.*, 81 N.Y.2d 958, 961, 598 N.Y.S.2d 761, 615 N.E.2d 218 (N.Y. 1993) (finding no implied private right of action existed in Article 29–H of the GBL, which authorizes only the Attorney General or a District Attorney to enforce its provisions, in light of the Legislature's decision to amend Article 22–A to expressly provide for a private cause of action); *Worldhomecenter.com, Inc. v. KWC Am., Inc.*, No. 10 Civ. 7781 (NRB), 2011 WL 4352390, at *8 (S.D.N.Y. Sept. 15, 2011) (because "[t]he Attorney General is … empowered to take action under N.Y. Executive Law § 63(12) against any person who demonstrates 'persistent fraud or illegality in the carrying on, conducting or transaction of business,' … implying a private right of action [under GBL § 369–a] would be inconsistent with this legislative scheme.").

Spangler also argues, unconvincingly, that the Assurance has the force of law merely because it references General Business Law Article 22-A, a subsection of which—§ 349 (h)—provides private citizens injured by deceptive business practices with the right to bring suit (Spangler Opp. 11).  However, the Assurance only refers to Article 22-A in the context of explaining why the Attorney General has authority to inspect the business practices of legal financing companies like Whitehaven, and does not make any reference to § 349, the only section of Article 22-A that could potentially authorize a private right of action.  Nor does Article 22-A indicate that an assurance between a private business and the Attorney General constitutes a law of the state.

Spangler thus fails to establish that a violation of the Assurance amounts to the type of violation of law or public policy that would render the arbitration clause unenforceable.[12] [13]

---

[12] Both parties also raise arguments with respect to whether Spangler, as a Florida resident, can receive protection from the Assurance given that, by its terms, it only applies "New York consumers."  The Assurance itself does not define "New York consumer."  Whitehaven argues that the Assurance only applies to New York residents.  Spangler asserts that he consumed from the New York marketplace because Whitehaven is a New York-based company, Whitehaven provided money to him through New York bank accounts, Whitehaven communicated to him from a New York telephone number and address, and the Finance Agreement contains a New York choice-of-law provision.  Spangler Opp. 11-12, 17-18.  He also argues that the Assurance protects *all* consumers, irrespective of their residency.  *Id.* at 13-17.  Neither party, however, provides a sufficient basis on which the Court might find in its favor on this point.  In any event, the Court need not reach this issue because it finds that the arbitration clause is enforceable even if Spangler were a New York consumer as contemplated by the Assurance.

[13] Whitehaven also argues that even if it had the force of law, the FAA preempts or invalidates the Assurance. Mem. Supp. Mot. Compel 17; Reply Supp. Mot. Compel 6-7.  The cases that Whitehaven cites in support of this point are distinguishable, however.  In *Marmet Health Care*, *Nitro-Lift*, and *Concepcion*, the Supreme Court found that the state courts wrongly refused to enforce the arbitration agreements at issue because "when state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward:  The conflicting rule is displaced by the FAA."  *Marmet Health Care Ctr., Inc. v. Brown*, -- U.S. --, 132 S. Ct. 1201, 1203 (2012); *Nitro-Lift Technologies, L.L.C. v. Howard*, -- U.S. --, 133 S. Ct. 500, 504 (2012); *AT&T Mobility LLC v. Concepcion*, -- U.S. --, 131 S. Ct. 1740, 1747 (2011).  Here, the Assurance is not a blanket state law prohibition of the arbitration of a particular type of claim; it only includes an agreement by nine participating companies to refrain from using mandatory arbitration clauses in certain cash advance transactions with New York consumers, not a categorical ban of arbitration clauses in litigation financing contracts.  And, as explained *supra*, it is not a state law in any event.

Whitehaven's discussion of *Allied-Bruce Terminix Companies v. Dobson* (Reply Supp. Mot. Compel 6-7) is similarly inapposite.  In *Dobson*, the Supreme Court decided that "[s]tates may regulate contracts, including arbitration clauses under general contract law principles . . . What States may not do is decide that a contract is fair enough to enforce all its basic terms . . . but not fair enough to enforce its arbitration clause."  *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 281 (1995).  This admonition does not apply here given that neither the Attorney

### b.  The Arbitration Clause Is Not Unconscionable.

Spangler also claims that the Court should enjoin Whitehaven from enforcing the arbitration clause because it is unconscionable and the Finance Agreement is a contract of adhesion.  Spangler Opp. 9, 12 n.4.  While the Second Circuit has expressed that "it is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we have often and emphatically applied," *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (quoting *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006)), arbitration clauses may be invalidated based upon "generally applicable contract defenses, such as fraud, duress, or unconscionability."  *Id.* (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

Under New York law, a contract is unconscionable when enforcement of its terms would be "grossly unreasonable or unconscionable" based on the "mores and business practices of the time and place."  *Ragone*, 595 F.3d at 121.  "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made."  *Id.* at 121-22; *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10, 534 N.E.2d 824, 828 (N.Y. 1988).  "The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice." *Gillman*, 534 N.E.2d at 828.  "The focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power."  *Id.*  As for the substantive unconscionability, the analysis focuses on the "substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged."  *Id.* at 829.

_____

General, nor New York State, has refused to enforce the arbitration clause in the Finance Agreement while finding its other terms to be valid.

Similarly, a "contract of adhesion" is one that "contains terms that are unfair and nonnegotiable and arises from a disparity of bargaining power or oppressive tactics." *Molino v. Sagamore*, 105 A.D.3d 922, 923, 963 N.Y.S.2d 355, 357 (App. Div. 3d Dep't 2013).

Spangler does not marshal any facts tending to show that the Finance Agreement is unconscionable, nor has he adduced any evidence indicating that he lacked a meaningful choice, that a disparity in bargaining power existed, or that the arbitration clause was unreasonably unfavorable to him. Quite the opposite, it is undisputed that Spangler entered into the Finance Agreement with the benefit of advice from his lawyer. Spangler does not assert that he is illiterate, nor does he deny that he signed the Finance Agreement. Moreover, the arbitration clause does not appear in fine print and indeed has the same print as other clauses. Spangler Opp. Ex. 2 (Finance Agreement). The Finance Agreement also contained numerous disclaimers in all capital letters and provided Spangler with the right to cancel the agreement and receive a full refund within three days after its execution. *Id.* (Finance Agreement at 4). Spangler did not elect to take advantage of this provision. Under New York law, even the lack of legal advice is not sufficient to establish procedural unconscionability of the contract, and the fine print of the clauses does not make them unconscionable as long as those clauses have the same font size and color with other clauses. *In re Conifer Realty LLC (EnviroTech Servs., Inc.)*, 106 A.D.3d 1251, 1253-55, 964 N.Y.S.2d 735, 738-40 (App. Div. 3d Dep't 2013) (finding valid agreement to arbitrate and rejecting argument that contracts were unconscionable and/or adhesive).

Moreover, the Court notes that, when examining the same arbitration clause as that at issue here, in a near-identical litigation financing agreement executed by Whitehaven—which, as here, was governed by New York law—the District Court for the Southern District of Illinois upheld the validity of the arbitration clause, rejected arguments that it was unconscionable, and

mandated the parties to arbitrate in the Southern District of New York.  *See Kelly v. Whitehaven Settlement Funding, LLC*, No. 09 Civ. 0541 (DRH), 2010 WL 746983 (S.D. Ill. Feb. 26, 2010).[14]

So too here, because Spangler entered into the Finance Agreement and accepted the arbitration clause voluntarily, with the benefit of advice from his counsel, and because the arbitration clause was not incorporated in a deceptive manner into the Finance Agreement, the Court finds that it is not unconscionable.  Nor has Spangler come close to demonstrating that enforcement of the arbitration clause will amount to enforcement of a contract of adhesion; he does not assert, for example, that the Finance Agreement arose from a disparity in bargaining power.  *See, e.g.*, *Molino*, 105 A.D.3d at 923.

### C.  Scope of Agreement to Arbitrate.

#### a.  The Scope of the Agreement to Arbitrate Includes All Claims between Spangler and Whitehaven Arising from the Finance Agreement.

The arbitration clause provides that "any controversy or claim arising out of or relating to [the Finance Agreement], including without limitation the interpretation, validity, enforceability or breach thereof, shall be settled by final, binding arbitration."  *See* Spangler Opp. Ex. 2 (Finance Agreement ¶ 26).  Accordingly, the Court finds that any claims by Whitehaven or Spangler regarding the "interpretation, validity, enforceability or breach" of the terms of the Finance Agreement, save for the arbitration clause, must be resolved by the arbitrator.

#### b.  Thatcher Will Not Be Compelled to Arbitrate.

Thatcher claims that he should not be compelled to arbitrate because he is not a signatory or a third-party beneficiary of the Finance Agreement.  Thatcher Br. 7-8.  Whitehaven also acknowledges that Thatcher was not a signatory to the Finance Agreement, and does not dispute that Thatcher is not a party to the arbitration clause.  *See* Reply Opp. Thatcher Br. 3.

---

[14] The parties did not appear to discuss the 2005 Assurance of Discontinuance in that case.

According to "common law principles of contract and agency law," courts generally "recognize[s] five theories for binding nonsignatories to arbitration agreements:  1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.  *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995).  The party seeking to arbitrate with a non-signatory bears the burden of proving one of the five listed theories.  *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004).  Since Whitehaven agrees with Thatcher, the non-signatory, that he is not bound by the arbitration clause in the Finance Agreement, the Court will not compel him to arbitrate with Whitehaven and Spangler.

### D.  The Indiana Proceeding Will Be Stayed With Respect To Claims Between Whitehaven and Spangler.

Whitehaven argues that the Court should stay the Indiana Proceeding pending the outcome of the arbitration with Spangler, but does not clearly describe the scope of the stay that it seeks.  Whitehaven asserts both that "[t]he [FAA] requires a federal court to enforce an arbitration clause and stay litigation that contravenes it, even in the presence of other persons who are parties to the underlying dispute but not party to the arbitration agreement," as well as that "[w]hen litigation involves multiple claims, only some of which are covered by an arbitration agreement, the district court must compel the arbitration of the covered claims."  Mem. Supp. Mot. Compel 18.  Though he lacks standing to challenge a stay with respect to litigation arising from the Finance Agreement, Thatcher argues that the Court should not stay the Indiana Proceeding with respect to his counter and cross-claims against Whitehaven or Spangler.  Thatcher Br. 10-12.

Section 3 of the FAA provides that:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration,

> the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Federal Arbitration Act, 9 U.S.C. § 3.  "A party seeking a stay pending arbitration bears the burden of establishing that there are issues common to the arbitration and the court, and that those issues will finally be determined by arbitration."  *Champion Auto Sales*, 943 F. Supp. 2d at 355 (internal citation and quotation marks omitted).  "If this test is met, the movant has the burden of showing that it will not hinder arbitration, that the arbitration will be resolved within a reasonable time, and that any delay that may occur will not cause undue hardship to the nonmoving party," but in the end, "[t]he decision whether to stay nonarbitrable claims pending arbitration" rests within the trial court's discretion.  *Id.* (citing *Acquaire v. Can. Dry Bottling*, 906 F. Supp. 819, 838 (E.D.N.Y. 1995)).

Here, the claims between Spangler and Whitehaven covered by the arbitration clause— i.e., those concerning the enforceability of the Finance Agreement—are also at issue in the Indiana Proceeding, and accordingly, the Indiana Proceeding must be stayed with respect to the claims between Whitehaven and Spangler.  *KPMG LLP v. Cocchi*, -- U.S. --, 132 S. Ct. 23, 24, 181 L. Ed. 2d 323 (2011) (holding that the FAA has been "interpreted to require that if a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration even if this will lead to piecemeal litigation").  Any disputes between Thatcher and Spangler, or Thatcher and Whitehaven, however, would not be subject to arbitration and accordingly, need not be stayed.[15]  *Id.*

---

[15] In any event, given that the Finance Agreement establishes a priority of distribution for the settlement proceeds from the Skyleign Spangler Litigation that places "liens with priority by operation of law" ahead of Whitehaven, depending upon the arbitrator's interpretation of the Finance Agreement, it is conceivable that Spangler might be ordered to pay Thatcher before paying Whitehaven.

## IV.    Conclusion

For the reasons set forth above, Petitioner's motion to compel arbitration is GRANTED

with respect to Respondent Spangler and the Indiana Proceeding is stayed as between Spangler

and Whitehaven.  The Clerk of the Court is respectfully directed to terminate the motion (Doc. 9)

and close the case.

It is SO ORDERED.

Dated:    September 10, 2014
          New York, New York

_____
Edgardo Ramos, U.S.D.J.